IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| James Brent Collins,<br><br>        Plaintiff,<br><br>vs.<br><br>Commissioner of Social Security<br>Administration,<br><br>        Defendant. | CASE NO. 1:23-cv-1140<br><br>DISTRICT JUDGE<br>Christopher A. Boyko<br><br>MAGISTRATE JUDGE<br>James E. Grimes Jr.<br><br>**REPORT &**<br>**RECOMMENDATION** |

Plaintiff James Brent Collins filed a complaint against the Commissioner of Social Security seeking judicial review of its decision denying disability insurance benefits. This Court has jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c). The Court referred this matter to a Magistrate Judge under Local Rule 72.2(b)(1) for the preparation of a Report and Recommendation. Following review, and for the reasons stated below, I recommend the District Court affirm the Commissioner's decision.

**Procedural background**

In February 2020, Collins filed an application for disability insurance benefits alleging a disability onset date of January 28, 2020.[1] Tr. 616–17. He

---

[1] "Once a finding of disability is made, the [agency] must determine the onset date of the disability." *McClanahan v. Comm'r of Soc. Sec.*, 193 F. App'x 422, 425 (6th Cir. 2006).

claimed that he was disabled due to dyslexia, dysgraphia,[2] difficulties with memory and concentration, mood disorders, depression, unprovoked irritability, attention deficit hyperactivity disorder, attention deficit disorder, degenerative disc disease, sleep apnea, degeneration of the left shoulder, gastroesophageal reflux disease, hearing loss, and exposure to lead. Tr. 522.

The Commissioner denied Collins's applications at the initial level and on reconsideration. Tr. 541–44, 552–55. Collins requested a hearing before an Administrative Law Judge (ALJ). Tr. 557–58. In May 2022, an ALJ held a hearing at which Collins and a vocational expert testified. Tr. 503–20. The ALJ issued a written decision the following month, finding that Collins was not disabled. Tr. 44–63. Collins requested Appeals Council review. Tr. 603–06. The ALJ's decision became final in April 2023, when the Appeals Council declined further review. Tr. 1–4; *see* 20 C.F.R. § 404.981.

Collins filed this action in June 2023. Doc. 1. In it, he asserts the following assignments of error:

> 1. The ALJ erred as his RFC finding that Plaintiff could perform work at the medium level of exertion was not supported by substantial evidence.

---

[2]     Dysgraphia is "a neurological condition in which someone has difficulty turning their thoughts into written language for their age and ability to think, despite exposure to adequate instruction and education." *Dysgraphia*, Cleveland Clinic Health Library, https://my.clevelandclinic.org/health/diseases/23294-dysgraphia [https://perma.cc/N7Y6-2UXM].

> 2. The ALJ committed harmful error when he failed to properly apply the criteria of Social Security Ruling 16-3p and failed to find that the intensity, persistence and limiting effects of Plaintiff's symptoms, including memory loss, precluded him from engaging in substantial gainful activity on a full-time and sustained basis.

Doc. 6, at 1.

### Factual background

*1. Personal and vocational evidence*

Collins was born in September 1963 and was 56 years old on his alleged disability onset date. Tr. 522. He has a bachelor's degree, attended graduate degree courses, and completed specialized nuclear power training with the United States Navy. Tr. 653. He previously held skilled positions as a nuclear facility manager, outage supervisor, and reactor operator. Tr. 507, 653–54.

*2. Physical health impairment evidence*

In April 2021, Collins saw King K. Ogbogu, M.D., at the Cleveland Veterans Affairs Medical Center, complaining of left shoulder pain and increasing weakness in his left arm, accompanied by numbness and tingling that radiated into his left index finger. Tr. 1797–99. X-rays revealed mild degenerative changes and no acute osseous abnormalities. Tr. 1797. Dr. Ogbogu noted that Collins' left bicep and triceps muscles were smaller than his right bicep and triceps muscles. Tr. 1799. He found that Collins did not have any obvious atrophy. *Id*. In Collins' left shoulder, Dr. Ogbogu observed nearly full flexion and abduction and slightly reduced strength, which Dr. Ogbogu

rated at "4+/5." *Id*. Dr. Ogbogu ordered a steroid injection which provided limited relief. *See* Tr. 1789 (detailing the injection procedure), 1799 (recording Collins's report in July that the April injections provided a few weeks of relief.).

Electromyography results from July 2021 revealed isolated chronic neurogenic changes in Collins's left bicep. Tr. 1699–1700. MRI results from September 2021 showed a small supraspinatus tear with partial surface tearing, mild glenohumeral osteoarthrosis with mild cartilage thinning, and moderate acromioclavicular[3] osteoarthrosis. Tr. 1722. The MRI also suggested bursal calcific tendinitis.[4] *Id*.

In October 2021, Collins saw Dr. Ogbogu for a follow-up. Collins reported that the prior injections provided three weeks of relief. Tr. 1698. He indicated that he had "only intermittent tingling in his thumb and no grip

---

[3]     A supraspinatus tear is a tear in the tendon of the supraspinatus muscle, which is part of the rotator cuff in the shoulder. *Supraspinatus Tear*, Physiopedia, https://www.physio-pedia.com/Supraspinatus_Tear?utm_source=physiopedia&utm_medium=search&utm_campaign=ongoing_internal.

The acromioclavicular joint is one of four joints that comprise the shoulder complex; it is located at top of the shoulder where the clavicle meets the shoulder blade, or acromion. *See* Christopher Bayne, M.D., It's Shoulder Arthritis—Now What?, UC Davis Department of Orthopaedic Surgery, https://health.ucdavis.edu/orthopaedics/specialties/shoulder-arthritis-shoulder-replacement-sacramento.html [https://perma.cc/UYE3-VCWX].

The glenohumeral joint is a "ball-and-socket joint on the outside of the shoulder … made up of the humerus (ball) and glenoid (socket)." *Id*.

[4]     Tendonitis in the rotator cuff is associated with bursae inflammation and damage to the shoulder tendon. *See Calcific Tendonitis*, Cleveland Clinic Health Library, https://my.clevelandclinic.org/health/diseases/21638-calcific-tendonitis [https://perma.cc/Q9TG-JNFZ]. A bursa is a "thin, membrane-lined sack that helps tendons move across other structures." *Id*.

weakness." *Id*. He denied any new weakness. *Id*. Dr. Ogbogu noted some atrophy in Collins's left shoulder and mild tenderness over his bicep tendon, however, he also found that Collins had normal flexion, abduction, and cervical range of motion. Tr. 1699. Carpal compression, Spurling's, and Hoffman's sign tests[5] were negative. *Id*. Dr. Ogbogu found that Collins had fully intact reflexes but slightly reduced strength—"4+/5"—in his left arm. Tr. 1699–1700. Dr. Ogbogu reviewed the September 2021 MRI results and noted that Collins's pectoral attachments were intact. Tr. 1700. X-rays of the cervical spine showed a straightening of the normal curvature of the spine as well as multilevel degenerative changes at C2–3, C4–5, and C5–6. Tr. 1570. Updated MRI results showed multilevel spondylosis[6] with varying degrees of spinal canal and neural foraminal narrowing[7] most severe at C5–6. Tr. 1570, 1696.

---

[5]      Spurling's test and Hoffman's sign are used to assess whether cervical nerve root compression is causing upper extremity numbness, pain, or sensory deficiencies. *See Spurling's Test*, Healthline Library, https://www.healthline.com/health/spurling-test [https://perma.cc/CF5Y-8P97]; *What Is the Hoffman Sign and What Does It Mean?*, Healthline Library, https://www.healthline.com/health/hoffman-sign [https://perma.cc/65EN-H6ZS].

[6]      Cervical spondylosis is "a general term for age-related wear and tear affecting the spinal disks in [the] neck." *Cervical Spondylosis*, Mayo Clinic Diseases & Conditions Library, https://www.mayoclinic.org/diseases-conditions/cervical-spondylosis/symptoms-causes/syc-20370787 [https://perma.cc/WY8Y-4X44].

[7]      Spinal canal stenosis, or narrowing, happens when the space around the spinal canal becomes too narrow, irritating the spinal cord or the nerves that branch from the spinal cord. *Spinal Stenosis*, Cleveland Clinic Health Library, https://my.clevelandclinic.org/health/diseases/17499-spinal-stenosis [https://perma.cc/NT9S-SZL3].

Computerized tomography scan results of Collins's cervical spine from January 2022 showed that at C2–3, Collins had a small central disc bulge with degenerative changes at the facet joints more pronounced on the left side than the right, and mild central canal compromise. Tr. 1166. At C4–5, Collins had "near total obliteration of the disc" with central and left disc bulges, degenerative changes at the facet joints more pronounced on his left side than his right, mild central canal compromise, and neural foramen compromise at the vertebral margin and facet joint which was mild on his right side and mild to moderate on his left. *Id.*

In January 2022, neurosurgeon Jeffrey T. Nelson, M.D., evaluated Collins. Tr. 1646–48. Dr. Nelson found that Collins had fully intact strength in his left arm except for his triceps, which had a slightly reduced strength of "4+" out of five. Tr. 1648. Dr. Nelson reviewed the computer tomography results and diagnosed Collins with a bulging disc at C5–6 accompanied by moderate to severe central canal stenosis, bilateral neuroforaminal stenosis, and, at C6–7, severe neuroforaminal stenosis on the right side. Tr. 1648. Dr. Nelson recommended cervical discectomy and fusion surgery. Tr. 1648, 1966.

Collins underwent the recommended spinal fusion surgery in April 2022. Tr. 1259, 1474, 1648. Five days later, he sought emergency treatment for severe, sharp pain radiating from his neck to his midback. *See* Tr. 1480. Treating physician Mustafa Al Jamal examined Collins and found fully intact strength and sensation in all four extremities. Tr. 1477–79. Dr. Al Jamal

observed no focal neurological findings or weakness. Tr. 1477. X-rays of Collins's cervical spine showed intact and stable hardware. Tr. 1159. A cervical spine MRI showed pre-vertebral soft tissue thickening that "could represent edema or blood products" from Collins's recent surgery, though it was "new compared to the postoperative examination." Tr. 1162–63. Dr. Al Jamal found it possible that Collins's pain was due to post-surgical swelling and prescribed Dilaudid. Tr. 1477. The following day, Collins reported that "everything was pretty much pain free" and that he was "doing ok." Tr. 1413. The treatment team confirmed that Collins was aware of an upcoming neurosurgical follow-up and authorized his discharge. *Id.*

### 3. Mental health impairment evidence

During his military service, Collins was exposed to lead paint and asbestos. Tr. 915. In January 2020, Collins saw Jerry C. Bell, D.O., at the Lake Health Physician Group. Tr. 758. Collins reported "recent lead exposure and memory loss." *Id.* He denied feeling down, depressed, or hopeless. *Id.* Collins indicated that he hadn't lost interest or pleasure in doing things "at all." *Id.* He denied having any pain. *Id.* He had a normal neurological examination with no focal deficits. Tr. 759.

Two weeks later, Collins had a follow-up with Dr. Bell. Tr. 755. He indicated that he had been forced to retire early and that, as a result, he was anxious and depressed. *Id.* Collins denied feeling down, depressed, or hopeless and indicated that he hadn't lost interest or pleasure in doing things "at all."

*Id*. Collins had an appropriate affect and a normal neurological examination. Tr. 756. Dr. Bell assessed Collins with anxiety. *Id*. Dr. Bell also ordered lead exposure testing and, in February 2020, laboratory results showed that Collins had elevated levels of lead in his urine. Tr. 875.

In April 2020, Collins saw neurologist Amani Ramahi, M.D., to address fatigue and memory issues that Collins attributed to lead exposure.[8] Tr. 948. Collins scored 17/22 on the Montreal Cognitive Assessment (MoCA) test, indicating mild cognitive impairment.[9] Tr. 958. Dr. Ramahi diagnosed Collins with "personality change due to organic disorder, personality change due to known physiological condition, unspecified anxiety disorder, and mild cognitive impairment." Tr. 959. Dr. Ramahi noted, however, that Collins's MoCA score was just one point below the minimum for a normal finding. Tr. 950. According to Dr. Ramahi, this "raised the distinct possibility" that Collins's score could be the result of untreated sleep apnea rather than

---

[8]     In severe cases of lead poisoning, a medical provider may recommend chelation therapy, in which the patient is given medication that binds to lead in the body, which allows the lead can be excreted through urination. *Lead Poisoning*, Mayo Clinic Diseases and Conditions Library, https://www.mayoclinic.org/diseases-conditions/lead-poisoning/diagnosis-treatment/drc-20354723 [https://perma.cc/5N5L-7JCP]. For adult patients with lead levels greater than 45 mcg/dL of blood, chelation therapy may be administered by injection. *Id*.

[9]     The MoCa test is a series of tasks that assesses how well the brain functions in eight cognitive domains. *The MoCa Test for Dementia*, Healthgrades, https://www.healthgrades.com/right-care/dementia/the-MoCa-montreal-cognitive-assessment-test-for-dementia [https://perma.cc/9H7Q-DQ9R]. Providers use the MoCa test to assess a brain condition, like mild cognitive impairment or dementia, and the severity of that condition. *Id*.

exposure to toxic metals. *Id*. Dr. Ramahi referred Collins to a sleep specialist and recommended follow-up cognitive testing. Tr. 952, 959. In a follow-up MoCA test one month later, Collins scored in the average range for cognitive functioning. Tr. 924.

In June 2020, Collins had a telemedicine initial appointment and assessment with Kendall Dupree, M.D., of Amen Clinics in Washington, D.C. Tr. 1003. Collins told Dr. Dupree that he wanted to "address and develop a treatment plan for attention deficit disorder, dyslexia, lead exposure, anger issue, memory issues, and concentration problems he was experiencing." Tr. 1003–04. He reported increasing difficulty with short-term memory and distraction while driving which had recently worsened. Tr. 1004.

Dr. Dupree found that Collins had a cooperative attitude, a linear thought process, and good insight and judgment. Tr. 1007–08. Collins's behavior, attention span, eye contact, and speech were normal. *Id*. He was able to perform serial sevens "well," and could recall three out of three objects immediately and two out of three objects after a period of five minutes. Tr. 1008. Dr. Dupree reviewed the results of a SPECT scan[10] of Collins's brain and found evidence consistent with a past brain injury or encephalopathy.[11] Tr.

---

[10]    A SPECT scan generates three dimensional images using a radioactive substance and a specialized camera. *SPECT Scan*, Mayo Clinic Tests & Procedures    Library,    https://www.mayoclinic.org/tests-procedures/spect-scan/about/pac-20384925 [https://perma.cc/3KBR-RHXB].

[11]    Encephalopathy refers to a group of conditions that cause brain dysfunction such as confusion, memory loss, or changes in personality.

1018. She diagnosed Collins with an attention and concentration deficit, an abnormal level of heavy metals in the blood, anxiety disorder, and obstructive sleep apnea. Tr. 1022. Dr. Dupree prescribed Intuniv,[12] recommended cerebral coordination exercises and the regular use of a CPAP machine, and suggested that Collins follow up with a functional medicine doctor to "rule out mold" and clear "heavy lead toxicity." Tr. 1022.

In September 2020, Collins had a telemedicine appointment with psychiatric nurse Janelle Rosen. Tr. 1923–30. Collins reported memory and concentration problems that he attributed to lead exposure. Tr. 1924–25. Rosen found Collins cooperative and pleasant with good eye contact, hygiene, and grooming. Tr. 1927. She noted that Collins was alert and fully oriented, with above average intelligence, a euthymic mood, normal speech, good concentration, fair insight and judgment, and a thought process that was logical, coherent, and goal directed. *Id*. Rosen prescribed Prozac and Wellbutrin. Tr. 1930.

---

*Encephalopathy*, Cleveland Clinic Health Library, https://my.clevelandclinic.org/health/diseases/encephalopathy [https://perma.cc/W82J-X6B2]. Encephalopathy has many types and potential causes, including infection, exposure to toxins, and the presence of an underlying condition. *Id*.

[12] Intuniv is the extended-release form of Guanfacine, which is primarily in children used to control symptoms of attention deficit hyperactivity disorder. *Guanfacine*, MedlinePlus Drugs, Herbs, and Supplements Library, https://medlineplus.gov/druginfo/meds/a601059.html [https://perma.cc/SHF8-FT74].

In November 2020, Collins had a videoconference follow-up with Rosen. Tr. 1890. Collins reported that had run out of Wellbutrin a few days earlier and had stopped taking Prozac because he began to experience unwanted side effects. Tr. 1890–91. Collins said that he had been attending an online course to become a personal trainer and was not experiencing as many issues with concentration as he had previously. Tr. 1891. He was exercising regularly and setting fitness goals. *Id*. Rosen discontinued Prozac and lowered Collins's dose of Wellbutrin. Tr. 1893.

During electromyography testing in July 2021, the technician observed that Collins was a "[p]leasant, healthy individual" with an appropriate mood and affect. Tr. 1699. These findings are consistent with mental status examinations throughout 2021 and 2022, in which providers generally found Collins alert, attentive, and cooperative with an intact memory, euthymic mood,[13] appropriate eye contact, normal cognition and behavior, and a normal thought process. *See, e.g.*, Tr. 1484, 1695, 1847, 1802, 1847.[14]

---

[13]     A euthymic [mood/affect] is tranquil, neither depressed nor manic. *See* Dorland's Illustrated Medical Dictionary 647 (33rd ed. 2020).

[14]     In the "medical information" section of his brief, Collins says that "[a]s of November 15, 2021, he was noted to have problems with his memory and concentration (Tr. 1677)." Doc. 6, at 2. The cited treatment note, however, doesn't include findings from a provider determining that Collins had such problems. Rather it contains Collins' self-report of memory and concentration concerns. Tr. 1677. Contrary to Collins implicit assertion, this is not a medical finding.

*4. Function report*

Collins completed an Adult Function Report in June 2020. Tr. 672–79. In it, he recited daily activities such as light physical exercise, light housework, sometimes cooking breakfast, trimming the grass while his son mowed the lawn, and checking his email. Tr. 673–74. Collins said that he went outside daily in the summer, drove himself and his wife to go shopping each week, and was able to go out alone. Tr. 675. He and his family attended church weekly. Tr. 676. Collins estimated that he and his wife shopped for clothes and food once per week in stores or online. Tr. 675. He was able to pay bills, count change, handle his own bank account, and use checks or money orders. *Id.* Collins maintained several hobbies and interests such as listening to books on tape, watching television, and exercising. Tr. 676.

*5. State agency and other medical opinion evidence.*[15]

In June 2020, state agency consultative physician Leon Hughes, M.D., reviewed the evidence. Tr. 521–29. Dr. Hughes found that Collins had multiple severe physical and mental impairments, but nonetheless retained residual

---

[15]     When a claimant applies for disability benefits, the state agency creates a record. The record includes the claimant's medical evidence. A state agency disability examiner and a state agency physician or psychologist review the claimant's record and determine whether and to what extent the claimant's condition affects his or her ability to work. If the state agency denies the claimant's application, the claimant can ask for reconsideration. On reconsideration, the state agency updates the record and a second disability examiner and doctor review the file and make a new determination. *See, e.g.*, 20 C.F.R. § 404.1615.

functional capacity (RFC)[16] to perform a full range of labor at a medium level of exertion. Tr. 524, 526, 529. Dr. Hughes found that Collins could lift or carry 50 pounds occasionally and 25 pounds frequently. Tr. 526. During an eight-hour workday, Collins could sit, stand, or walk for a total of six hours. *Id*. Dr. Hughes found that Collins had no postural, manipulative, visual, communicative, or environmental limitations. *Id*.

In September 2020, consultative examiner Joseph Konieczny, Ph.D, conducted a psychological evaluation. Tr. 1097–1102. Collins told Dr. Konieczny that he typically woke up at around 9:00 A.M. and could dress himself, though he only dressed if he needed to leave his house. Tr. 1100. Collins said that he did not eat breakfast and instead spent his mornings watching television. *Id*. He ate lunch, did household chores, and took a nap. *Id*. Collins spent his evenings watching television and spending time with his wife and son before going to bed around 1:30 a.m. *Id*. He attended church regularly and occasionally engaged in social activities with friends. *Id*. Collins had a valid driver's license and participated in routine driving obligations. *Id*. He could prepare simple meals, though his wife did the majority of the cooking. *Id*. Collins participated in cleaning, laundry, and other household chores "to

---

[16]    An RFC is an "assessment of" a claimant's ability to work, taking his or her "limitations … into account." *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Circ. 2002). Essentially, it is the Social Security Administration's "description of what the claimant 'can and cannot do.'" *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 631 (6th Cir. 2004) (quoting *Howard*, 276 F.3d at 239).

the extent to which he perceive[d] he [was] physically capable." *Id*. He did his own shopping and managed his own finances. *Id*.

Dr. Konieczny observed that Collins seemed "quite capable of expressing himself in a clear and coherent manner." Tr. 1100. He found Collins cooperative, with normal speech and appropriate eye contact. Tr. 1099–1100. Dr. Konieczny found that Collins was well oriented and had unimpaired attention and concentration with normal insight and judgment. Tr. 1100. Dr. Konieczny administered an intelligence test on which Collins scored in the high average range. Tr. 1101. He found that Collins had superior functioning in the areas of verbal comprehension and perceptual reasoning, average functioning in processing speed, and significant deficits in working memory. *Id*. Dr. Konieczny diagnosed Collins with mild "Major Neurocognitive Disorder of unknown origin (possibly due to elevated lead levels), without behavioral impairment." Tr. 1102. Dr. Konieczny also diagnosed Collins with "Other Specified Depressive Disorder" marked by "depressive episodes with insufficient symptoms." *Id*.

Dr. Konieczny opined that due to neurocognitive deficits, Collins would have limitations in the ability to understand, remember, and carry out instructions. Tr. 1102. He found that due to his neurocognitive deficits and depressive symptoms, Collins would have limitations in the ability to maintain focus and persistence on moderate to complex multi-step tasks. *Id*. Dr. Konieczny opined that Collins's depressive symptoms and neurocognitive

14

deficits would diminish his tolerance for frustration and limit his coping skills, which would affect the ability to respond appropriately to supervision and interpersonal situations in a vocational setting. *See id*. Dr. Konieczny found that these symptoms and deficits would also diminish Collins's tolerance for frustration and ability to cope with typical work pressures. *Id*.

In October 2020, state agency consultative psychologist Audrey Todd, Ph.D., reviewed the evidence and found that Collins was moderately limited in each of the four vocationally-relevant areas of mental functioning: understanding and memory, sustained concentration and persistence, social interaction, and adaptation.[17] Tr. 527–28. Dr. Todd determined that Collins nonetheless retained the mental RFC to perform simple tasks with one to two steps and occasionally perform tasks with three to four steps if he was not subject to strict production quotas. Tr. 527. Dr. Todd opined that Collins retained the capacity to interact with coworkers and the general public on an infrequent, superficial basis. Tr. 528. She found that Collins could perform work with infrequent changes and where he could adjust to changes over time. *Id*. Dr. Todd acknowledged that Collins needed "some reminders" from his wife

---

[17]    The Social Security Administration divides the mental functioning necessary in a work setting into four broad areas: (1) understanding, remembering, or applying information; (2) interacting with others; (3) concentrating, persisting, or maintaining pace; and (4) adapting or managing oneself. 20 C.F.R. § Pt. 404, Subpt. P, App. 1, 12.00A1. When the Commissioner evaluates a claimant's mental functioning, he considers these four broad areas as well as the claimant's ability to function independently, appropriately, effectively, and on a sustained basis. *Id*.

regarding paperwork, but noted that he was "very involved in his church" and able to do "lots of hands-on activities for the church" for which he did not require assistance. Tr. 528.

In August 2021, consultative examiner Dorothy Bradford, M.D., conducted a physical examination. Tr. 1116–25. Dr. Bradford found that Collins had normal—"5" out of five—muscle strength throughout his body. Tr. 1117. His gait, station, and range of motion were normal. Tr. 1117–18. His hands had full—"5" out of five—grip strength and dexterity. Tr. 1118. Dr. Bradford ordered x-rays of Collins's lumbar spine and left shoulder. Tr. 1113–14. The images of his lumbar spine showed normal vertebral body heights, diffuse arthritis, and probable multilevel stenosis. Tr. 1113. The images of his left shoulder showed mild acromioclavicular and glenohumeral arthritis. Tr. 1114. Dr. Bradford diagnosed Collins with degenerative joint disease of the lumbar spine without radiculopathy and hypertension and found that Collins had no activity restrictions. Tr. 1125.

State agency consultative physician Lynne Torello, M.D., reviewed the evidence on reconsideration in August 2021. Tr. 530–39. Dr. Torello affirmed Dr. Hughes' findings and adopted his opinions, including that Collins was capable of work that required a medium exertional level. Tr. 535. Citing Collins's full range of motion in his shoulder and lumbar spine and normal strength despite osteoarthritis, Dr. Torello agreed with Dr. Hughes that

Collins had no postural, manipulative, visual, communicative, or environmental limitations. *Id*.

In September 2021, state agency consultative psychologist Cindy Matyi, Ph.D., reviewed the evidence on reconsideration. Tr. 533–34. Dr. Mayti affirmed Dr. Todd's findings, including that Collins had moderate limitations in each of the four broad areas of mental functioning. Tr. 535. Dr. Mayti indicated that Dr. Todd's findings were consistent with and supported by the evidence available during the initial stage of review and that the record available during reconsideration supported Dr. Todd's opinions and analysis. *See* Tr. 533.

### 6. *Testimonial evidence*

Collins and a vocational expert testified during the hearing in May 2022. Tr. 503–20. Collins was represented by attorney Michelle Marshall. Tr. 503, 512–14, 519. Collins told the ALJ that he was forced into early retirement in 2019 because he was unable to concentrate. Tr. 508. He attributed his concentration and other cognitive issues to "lead poisoning" which he suffered early in his career. *Id*. He said that he had back and shoulder problems, numbness in his arms, and pain that radiated through his legs. Tr. 512–14.

After Collins, vocational expert Ja'Nitta Marbury testified. Tr. 515. According to Marbury, a hypothetical individual with the same age, education, and work experience as Collins and with the limitations assessed in Collins's RFC, described below, could not perform any of Collins's past relevant work.

17

Tr. 516, 518. Such an individual could, however, perform unskilled labor requiring a medium level of exertion such as dryer attendant, linen room attendant, and janitor. Tr. 518. Being off task for more than 10 percent of the work day or absent for more than one day per month on an ongoing basis would preclude such an individual from all work. Tr. 519.

> 7. *Service-connected disability compensation from the Department of Veterans Affairs*

In February 2020, the Department of Veterans Affairs submitted a letter certifying that Collins was receiving military service-connected disability compensation as of August 2004 with respect to several conditions. *See* Tr. 610–12. These conditions included degenerative disc disease at L2–3, obstructive sleep apnea syndrome, degenerative changes to the left acromioclavicular joint with a history of partial pectoral muscle rupture, gastroesophageal reflux disease. Tr. 610. The letter also recited several conditions for which Collins had no associated service-connected disability rating, including plantar fasciitis, hearing loss, right inguinal hernia, and lipoma and fatty tissue removal. Tr. 610–11.

**The ALJ's decision**

The ALJ made the following findings of fact and conclusions of law:

> 1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2025.
>
> 2. The claimant has not engaged in substantial gainful activity since January 28, 2020, the alleged onset date (20 CFR 404.1571 *et seq*.).

18

3.  The claimant has the following severe impairments: obstructive sleep apnea, disorder of the cervical and lumbar spine, essential hypertension, left shoulder dysfunction, neurocognitive disorder, depressive disorder, and anxiety disorder (20 CFR 404.1520(c)).

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.  After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c), meaning he can lift/carry 50 pounds occasionally and 25 pounds frequently, can stand six hours out of an eight-hour work day, can walk six hours out of an eight-hour workday, and can sit for six hours out of an eight-hour workday; no limits for push/pull or foot pedal; no postural, manipulative, visual, communication, or environmental limitations; however, can do no complex tasks but can do simple (routine) tasks which I define to mean this person has the basic mental aptitude to meet the demands of competitive, remunerative, unskilled work which includes the abilities to, on a sustained basis, understand, carry out, and remember simple instructions; can do detailed, but not complex tasks; can make work related decisions; can respond appropriately to supervision, coworkers, and usual work situations; and can deal with changes in routine work settings; can focus attention on simple or routine work activities for at least two hours at a time and can stay on task at a sustained rate such as initiating and performing a task that they understand and know how to do; can ignore or avoid distractions while working; can change activities or work settings without being disruptive; can do no high production quotas or piece rate work; can have superficial, occasional

interactions with public, co-workers meaning limited to speaking, signaling, taking instructions, asking questions and similar contact but with no arbitration, negotiation, confrontation, supervision, or commercial driving.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7. The claimant was born [i]n September … 1963 and was 56 years old, which is defined as an individual of advanced age, on the alleged disability onset date (20 CFR 404.1563).

8. The claimant has at least a high school education (20 CFR 404.1564). Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

9. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969a). Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569a).

Tr. 46–63.[18]

---

[18]    In his recitation of the facts, Collins discusses Veterans Affairs evidence that he submitted to the Appeals Council after the ALJ issued his decision. *See* Doc. 6, at 5. He does not, however, mention this evidence again. In any event, this evidence is not relevant to this Court's determination. *See Pierson v. Comm'r of Soc. Sec.*, No. 21-2848, 2022 WL 819735, at *3 (6th Cir. Mar. 18, 2022); *Casey v. Sec'y of Health & Hum. Servs.*, 987 F.2d 1230, 1233 (6th Cir. 1993) (per curiam).

**Standard for disability**

Eligibility for benefit payments depends on the existence of a disability. 42 U.S.C. §§ 423(a, 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(a)(3)(A).

An ALJ is required to follow a five-step sequential analysis to make a disability determination:

1. Is the claimant engaged in substantial gainful activity? If so, the claimant is not disabled.

2. Does the claimant have a medically determinable impairment, or a combination of impairments, that is "severe"? If not, the claimant is not disabled.

3. Does the claimant's impairment meet or equal one of the listed impairments and meet the duration requirement? If so, the claimant is disabled. If not, the ALJ proceeds to the next step.

4. What is the claimant's residual functional capacity, and can the claimant perform past relevant work? If so, the claimant is not disabled. If not, the ALJ proceeds to the next step.

5. Can the claimant do any other work considering the claimant's residual functional capacity, age, education, and work experience? If so, the claimant is not disabled. If not, the claimant is disabled.

20 C.F.R. §§ 404.1520, 404.1520. Under this sequential analysis, the claimant has the burden of proof at steps one through four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at step five to establish whether the claimant has the vocational factors to perform available work in the national economy. *Id.* If a claimant satisfies each element of the analysis and meets the duration requirements, the claimant is determined to be disabled. *Id.*

### Standard of review

A reviewing court must affirm the Commissioner's conclusions unless it determines "that the ALJ has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Jordan*, 548 F.3d at 422. "'[S]ubstantial evidence' is a 'term of art'" under which "a court … asks whether" the "existing administrative record … contains 'sufficien[t] evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (citations omitted). The substantial evidence standard "is not high." *Id.* Substantial evidence "is 'more than a mere scintilla'" but it "means only[] 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (citations omitted). The Commissioner's "findings … as to any fact if supported by substantial evidence [are] conclusive." 42 U.S.C. § 405(g); *Biestek*, 139 S. Ct. at 1152.

A court may "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir.

2007). Even if substantial evidence or a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "'zone of choice within which'" the Commissioner can act, without fear of court "'interference.'" *Lindsley v. Comm'r of Soc. Sec.*, 560 F.3d 601, 605 (6th Cir. 2009) (quoting *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994)).

**Discussion**

1. *Whether substantial evidence supports the ALJ's RFC determination that Collins retained the capacity to perform work with a medium level of exertion and additional limitations*

Collins challenges the ALJ's RFC determination and claims that it is not supported by substantial evidence. Doc. 6, at 10.

An individual's RFC is "'the maximum degree to which the individual retains the capacity for sustained performance of the physical-mental requirements of jobs.'" *Mokbel-Aljahmi v. Comm'r of Soc. Sec.*, 732 F. App'x 395, 399 (6th Cir. 2018) (quoting 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 200.00(c)); *see also Howard*, 276 F.3d at 239(explaining that an RFC is an "'assessment of'" a claimant's ability to work, taking his or her "limitations … into account") (quoting 20 C.F.R. § 416.945).

Importantly, it is the claimant's burden to establish that he or she has a medically determinable impairment and the extent to which that impairment

affects his or her ability to function. *See* 20 C.F.R. §404.1512 ("In general, you have to prove to us that you are blind or disabled."); *see also Gutierrez v. Bowen*, 875 F.2d 864 (6th Cir. 1989) ("The burden is on the claimant to establish a prima facie case of disability."); *Woelk v. Comm'r of Soc. Sec.*, No. 13-12411, 2014 WL 2931404, at *6 (E.D. Mich. May 15, 2014), *report and recommendation adopted*, 2014 WL 2931411 (E.D. Mich. June 30, 2014) ("The regulations explicitly provide that it is the claimant who bears the burden of establishing the existence of disability."). Even at step five, it is not the Commissioner's burden "to prove a claimant's" RFC. *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999).

An ALJ must not only determine whether a claimant has established the presence or diagnosis of a medically determinable impairment, but also the degree to which that impairment has resulted in vocationally relevant functional limitations on the claimant's ability to work. *See* 20 C.F.R. § 404.1512(c) ("You must provide medical evidence showing that you have an impairment and how severe it is during the time you say that you are disabled. You must provide evidence, without redaction, showing how your impairment affects your functioning during the time you say that you are disabled, and any other information that we need to decide your claim."); *see also Her*, 203 F.3d at 391 ("it is not unfair to require a claimant to prove the extent of his impairments"). A claimant's recitation of subjective symptoms "will not alone establish that you are disabled." 20 C.F.R. § 404.1529(a).

Here, the ALJ found that Collins's impairments of obstructive sleep apnea, disorder of the cervical and lumbar spine, essential hypertension, left shoulder dysfunction, neurocognitive disorder, depressive disorder, and anxiety disorder were severe. Tr. 47. Despite these severe physical and mental impairments, the ALJ nonetheless determined that Collins's maximum capacity allowed him to perform medium exertion-level labor as defined by the Social Security Administration. Tr. 50–51.

Medium work is defined at 20 C.F.R. § 404.1567(c) as "lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds." The ALJ added further restrictions to Collins's RFC, restricting Collins from performing complex tasks. Tr. 50. The ALJ prohibited piece rate work and work that would require Collins to meet a high production quota. *Id*. The ALJ found that Collins was capable of no more than superficial, occasional interaction with the public and his co-workers, clarifying that this meant that Collins was limited to speaking, signaling, taking instructions, asking questions and other similar contact and unable to engage in arbitration, negotiation, confrontation, supervision, or commercial driving. Tr. 50.

In arriving at this conclusion, the ALJ explicitly considered Collins's subjective complaints of disabling physical limitations. For example, the ALJ cited Collins's testimony regarding how difficult it was for him to learn new computer programs, read and retain information, and think strategically. Tr. 51. The ALJ cited Collins's testimony about how it was hard for him to control

his anger and get along or work with others. *Id*. The ALJ considered Collins's statements that he woke up in the night frequently and took daytime naps as a result. *Id*. The ALJ cited Collins's purported difficulty with bending, standing, memory, task completion, concentration, and following instructions. Tr. 51 (citing Tr. 642–48, 672–79). He acknowledged Collins' left shoulder and lower back issues. Tr. 51. After thorough consideration of the evidence, the ALJ concluded that Collins had established the existence of medically determinable impairments that could be reasonably expected to cause the symptoms he alleged. *Id*.

The ALJ credited Collins's experience of "the limiting signs and symptoms associated with his severe impairments," Tr. 58, devoting seven pages of his 20-page decision to a recitation of those signs and symptoms, *see* Tr. 51–58. The ALJ found, however, that Collins's statements concerning the intensity, persistence, and limiting effects of these symptoms were "not entirely consistent with the medical evidence and other evidence in the record." Tr. 51. The ALJ explained that Collins's statements about the "intensity, persistence, and limiting effects of his symptoms [were] inconsistent because they [were] not altogether consistent with the objective findings." Tr. 59.

Despite the alleged severity of Collins's left shoulder symptoms, the ALJ noted consistent physical examination findings of fully intact muscle strength, which was only slightly reduced—"4+" out of five—in his left shoulder. *See* Tr. 59, *see also* Tr. 1118, 1121, 1477–79, 1648, 1700. The ALJ cited objective

26

medical records containing consistent findings of a normal gait and intact reflexes without spinal tenderness, in contrast to the fact that these records did not reflect consistent sensory deficits, weakness, loss of strength, or loss of range of motion. Tr. 59 (citing Tr. 885–91, 1116–26, 1412–80, 1698–1700, 1796–99). The ALJ determined that Collins's claims were further eroded by the regular findings of nearly full flexion and abduction of Collins's left shoulder. *Id* (*citing, for example*, Tr. 1796–99). The ALJ observed that shortly after cervical spinal fusion surgery, Collins returned to independent mobility and "appeared close to his functional baseline." *Id* (citing Tr. 1255–56). In support of these findings, the ALJ also cited evidence of Collins's noncompliance with treatment, such as his discontinuation of medication without consulting his doctor and his reluctance to use his CPAP machine. *Id* (citing Tr. 1734–39, 1757–60, 1890–91, 1896–99).

The ALJ also cited Collins's self-reported performance of robust daily activities to support finding that Collins's impairments were not as severe as he alleged. For example, Collins said that he could "drive, perform some yardwork," shop, "prepare simple meals," and tend to his self-care needs. Tr. 49, 59 (citing Tr. 672–79, 793–96, 1888–94). The ALJ noted that the record also reflected Collins's ability to participate in active physical activities such as exercise and "the hobby of hunting." Tr. 59.

The ALJ cited medical providers, who routinely found that Collins was "pleasant, cooperative, and able to maintain appropriate eye contact upon

examination with findings of appropriate grooming [and] hygiene and a normal [or] euthymic mood and affect." *Id.* (citing Tr. 755–57, 761–63, 773–76, 922–26, 1003–48, 1055–96, 1097–1104, 1483–85, 1611–20, 1693–95, 1800–02, 1846–47, 1923–30, 1951–53).

The ALJ considered the findings of the medical experts who found that Collins had a normal attention span, an attentive presentation, a normal, linear, or logical thought process, and intact memory and cognition skills. *Id* (citing Tr. 1483–85, 1693–95, 1800–02, 1846–47, 1923–30 1937–39, 1951–53). The ALJ cited cognitive functioning test results in which Collins scored in the normal range. *Id* (citing Tr. 924). The ALJ observed that despite evidence indicating some intellectual decline, possibly secondary to lead exposure, Collins maintained a "full-scale IQ of 113 which was within the high average range of intellectual functioning" and "verbal comprehension and perceptual reasoning index scores within the superior range." *Id* (citing Tr. 1097–1104).

In addition to medical records and subjective statements, the ALJ found support for Collins's RFC in the medical opinion evidence. *See* Tr. 60. The state agency consultants determined that Collins was capable of performing a full range of medium-exertion work. Tr. 529, 538. ALJ found persuasive these opinions, noting that they were consistent with the objective medical evidence and with Collins's reports of his daily activities. Tr. 60. To the extent that the ultimate assessment of consultative examiner Dr. Bradford—that Collins had no physical restrictions—supported the ALJ's determination that "the level of

limitation alleged [was] not consistent with the objective findings or [Collins's] level of daily activity," the ALJ said that he found Dr. Bradford's medical opinions persuasive. Tr. 60 (citing Tr. 1116–25).

"Nonetheless," the ALJ found, "functional limitations [were] warranted." Tr. 59. He credited Collins's hypertension, intellectual decline, memory deficits, attention, vigilance, and impulse control problems, insight and judgment issues, inability to handle stress, mood abnormalities, and social deficits and explained how he had accounted for them in the RFC:

> To avoid exacerbating his hypertension with overexertion and to account for degeneration in his cervical spine, lumbar spine, and left shoulder, he should stand/walk/sit no more than six hours each in an eight-hour workday and lift/carry no more than 50 pounds occasionally and 25 pounds frequently. To account for his intellectual decline and brain changes on brain SPECT imaging possibly secondary to his history of lead exposure and the effects of his obstructive sleep apnea, to include significant memory deficits in the specific index areas of auditory memory, visual working memory, immediate memory, and delayed memory, he could do simple (routine) tasks, meaning he has the basic mental aptitude to meet the demands of competitive, remunerative, unskilled work which includes the abilities to, on a sustained basis, understand, carry out, and remember simple instructions; he can do detailed, but not complex tasks; and can make work related decisions. Due to findings of perseverative errors relative to the normative sample on a test of attention, vigilance, and impulse control, he can focus attention on simple or routine work activities for at least two hours at a time and can stay on task at a sustained rate such as initiating and performing a task that they understand and know how to do; can ignore or avoid distractions while working; and can change activities or work settings without being

> disruptive. Due to deficits in insight and judgment and to avoid exacerbating his symptoms with stress, he can do no high production quotas or piece rate work. To account for his mood abnormalities and reported deficits with interacting with others, he can have superficial, occasional interactions with public, co-workers meaning limited to speaking, signaling, taking instructions, asking questions and similar contact but with no arbitration, negotiation, confrontation, supervision, or commercial driving.

Tr. 59–60.

Collins challenges the ALJ's crafting of the RFC and alleges that the RFC is not based on substantial evidence because the ALJ inappropriately relied on Dr. Bradford's medical findings and "failed to account for his continuing numbness and residual radiculopathy."[19] Doc. 6, at 11–13. Collins's characterization of the evidence disregards the standard of review, ignores the ALJ's decision, and neglects Collins's own hearing testimony.

Collins reiterates the Social Security Administration's definition of medium work, specifically noting the standing, walking, grasping, holding, and turning requirements. *See* Doc. 6, at 10. He then says that the ALJ's determination was "contrary to the evidence in this matter." *See id*. Collins essentially argues that because he believes he has substantial evidence to support an RFC with greater limitations, substantial evidence doesn't support

---

[19]     Collins asserts that the ALJ erred by basing "his RFC determination on the fact that Plaintiff did not require the use of an assistive device[,] … had no activity restrictions… , and … was stable with treatment. Doc. 6, at 11. But other than reciting facts that might support these assertions, he never mentions  them again. Collins has thus forfeited these points. *See McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997).

the ALJ's less-limited findings. *See* Doc. 6, at 10–11, 14. But despite Collins's framing of his argument, this Court is not responsible for determining whether, in fact, he was capable of sustaining medium work with the additional limitations determined by the ALJ. *See* Doc. 6, at 10. Deciding that would require the Court to reweigh the evidence, which it cannot do. *Rottmann v. Comm'r of Soc. Sec.*, 817 F. App'x. 192, 196 (6th Cir. 2020).

Moreover, whether substantial evidence exists to support a more restrictive RFC is irrelevant, because Collins fails to show that the ALJ's RFC finding—that Collins was capable of performing the standing, walking, lifting, grasping, holding, and turning requirements for medium work—was *not* supported by substantial evidence. And "[s]o long as substantial evidence supports the conclusion reached by the ALJ," it doesn't matter if substantial evidence also supports a claimant's position. *See Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997).

Collins says that substantial evidence does not support the ALJ's findings, specifically as concerns the Veterans Affairs findings of Collins's service-connected conditions. *See* Doc. 6, at 11, 13. He objects to the fact that the ALJ did not specifically reference any consideration of the Veterans Affairs' findings that Collins was eligible for service-connected disability compensation. Doc. 6, at 11.

As an initial matter, and as Collins partially acknowledges, for decisions issued after March 2017, social security regulations provide that the Social

31

Security Administration "will not provide any analysis in [its] determination or decision about a [Veterans Affairs] decision … about whether" a claimant is "disabled, blind, employable, or entitled to any benefits." 20 C.F.R. § 404.1504; *see also* 20 C.F.R. § 404.1520b(c)(1). To the extent that Collins argues that the ALJ "[f]ail[ed] to follow the appropriate regulation," he is mistaken.

Collins also ignores the fact that the ALJ did, in fact, consider relevant evidence submitted by providers with the Department of Veterans Affairs who treated Collins throughout the relevant time period.[20] And the ALJ explained how he accounted for this evidence in accord with the rules and regulations that bind his evaluation of Collins's application. The ALJ considered the evidence cited in the letter from the Department of Veterans Affairs, including symptoms of "anxiety; chronic sleep impairment; depressed mood; difficulty … establishing and maintaining effective work and social relationships; disturbances of motivation and mood; forgetting directions, … names, and … recent events; [the fact that a] mental condition ha[d] been formally diagnosed; mild memory loss; occupational and social impairment with occasional decrease in work efficiency and intermittent periods of inability to perform occupational tasks (although generally functioning satisfactorily, with routine behavior, self-care, and conversation normal); panic attacks; … and suspiciousness." *See* Tr. 51–61, 610–11. The ALJ thus did not err in his

---

[20] The relevant time period is from January 28, 2020, to July 15, 2022.

consideration of the evidence and opinions of the Department of Veterans Affairs.

To the extent that Collins argues that the ALJ erred in his consideration of Dr. Bradford's medical opinion, he is likewise mistaken. *See* Doc. 6, at 12–13. According to Collins, "Dr. Bradford's conclusion that [Collins] did not have radiculopathy was contradicted by the VA notation on October 18, 2021 that Plaintiff had left arm weakness and cervical radiculopathy." *Id*. at 13 (citing Tr. 1168). Collins says that "[t]his was followed by a report on March 16, 2022, that Plaintiff had neck pain with radiculopathy to his thumb on the left side." *Id* (citing Tr. 1300). Collins says that due to the fact that Dr. Bradford completed her physical examination before Collins's spinal fusion surgery, her medical opinions are "not indicative" of Collins's post-surgery abilities and limitations. Doc. 6, at 12–13. He says that the records generated after his surgery "established that the ALJ erroneously relied on the snapshot of [his] condition in August 2021 rather than the deterioration which culminated in surgery in April 2022." Doc. 6, at 13.

But this ignores the fact that *after* his spinal fusion surgery, Collins had "[n]o radiculopathy." Tr. 1521. Further, the ALJ did not rely exclusively on Dr. Bradford's medical opinions in crafting the RFC. He instead considered the entire record, which contained ample evidence of Collins's post-surgery condition. What's more, in his 20-page decision, the ALJ dedicated two paragraphs to Dr. Bradford's opinion—one recounting what she said, Tr, 56,

and one explaining why her opinion was "persuasive in that it supports that the level of limitation alleged is not consistent with objective findings or his level of daily activity," Tr. 60. Although Collins takes issue with the fact that Dr. Bradford's assessment was completed before his surgery, the ALJ noted that just days after surgery, Collins "completed all mobility without assistance … and appeared close to his functional baseline." Tr. 57. Tr. 59. Collins has not demonstrated that the ALJ unduly relied on Dr. Bradford's medical opinions; rather, the ALJ demonstrated that he had considered Dr. Bradford's opinions as part of the record as a whole.  The ALJ thus did not err in his consideration of Dr. Bradford's medical opinion evidence.

Collins argues that the ALJ discounted testimonial evidence of ongoing numbness and tingling in Collins's arms and alleges that the ALJ erred in finding that Collins was capable of work at a medium exertional level. Doc. 6, at 13. Collins says that he would not be able to lift or carry 25 pounds frequently or 50 pounds occasionally as a result of his persistent arm issues. *Id*. But the ALJ considered Collins's subjective symptoms and explained that he did not fully credit them as "not altogether consistent with the objective findings." Tr. 59. As previously cited, the ALJ recited objective medical evidence related to arm strength on which he relied, including findings of overall normal strength, normal grip, and Collins's ability to go hunting and complete light yardwork. *See* Tr. 59 (citing Tr. 672–79, 793–96, 1888–94). And Collins hasn't shown any flaw in the ALJ's logic or otherwise demonstrated

34

how substantial evidence did not support the ALJ's finding that despite numbness and tingling, Collins was capable of work at a medium level of exertion.

So the ALJ determined that Collins was capable of medium-level work with additional limitations and supported this determination with substantial evidence in the record. *See* Tr. 50. Collins hasn't shown that substantial evidence does not support the ALJ's findings and thus his RFC challenge fails. Remand is not warranted.

     2. *Whether the ALJ properly applied the criteria of Social Security Ruling (SSR) 16-3p in evaluating the intensity, persistence and limiting effects of Collins's symptoms and supported his findings with substantial evidence.*

Collins argues that the ALJ "failed to properly consider all relevant factors set forth in SSR 16-3p[] or otherwise sufficiently explain his reasoning." Doc. 6, at 14–15; *see* Social Security Ruling 16-3p Titles II And XVI: Evaluation Of Symptoms In Disability Claims Social Security Ruling 16-3p Titles II And XVI: Evaluation Of Symptoms In Disability Claims, 82 Fed. Reg. 49,462 (Oct. 25, 2017). Ruling 16-3p provides "a two-step process for evaluating an individual's symptoms." 82 Fed. Reg. at 49,463. At step one, the ALJ should "determine whether the individual has a medically determinable impairment (MDI) that could reasonably be expected to produce the individual's alleged symptoms." *Id*. At step two, the ALJ should "evaluate the intensity and persistence of an individual's symptoms such as pain and determine the extent to which an individual's symptoms limit his or her ability to perform work-

related activities for an adult or to function independently, appropriately, and effectively in an age-appropriate manner for a child with a title XVI disability claim." *Id.* at 49,464.

Here, the ALJ identified the correct test and applied it. *See* Tr. 51. He found that Collins satisfied step one and that Collins's "medically determinable impairments could reasonably be expected to cause the alleged symptoms." Tr. 51. So the issue is about step two.

Under step two, the ALJ should consider the objective medical evidence and other evidence, including an individual's statements, medical sources, and non-medical sources. 82 Fed. Reg. at 49,464–65. And when "evaluat[ing] the intensity, persistence, and limiting effects of an individual's symptoms," the ALJ should consider the factors in 20 C.F.R. §§ 404.1529(c)(3) and 416.929(c)(3). *Id.* at 49,465.

These factors are daily activities; the location, duration, frequency, and intensity of pain or other symptoms; factors that precipitate and aggravate the symptoms; the type, dosage, effectiveness, and side effects of any medication an individual takes or has taken to alleviate pain or other symptoms; treatment, other than medication, an individual receives or has received for relief of pain or other symptoms; any measures other than treatment an individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a

36

board); and any other factors concerning an individual's functional limitations and restrictions due to pain or other symptoms. *Id*. at 49,465–66.

The ALJ recounted the two-step analysis required by Ruling 16-3p. Tr. 51. So he was plainly aware of Ruling 16-3p. And after stating the analysis, he discussed the factors in Ruling 16-3p, albeit without specifically stating each factor. *See* Tr. 51.

With specific reference to memory, focus, and persistence, the ALJ recited Collins's daily activities and Collins's testimony about how his memory loss affected his ability to learn new computer programs, read and retain information, and made him unable to think strategically. Tr. 51. The ALJ discussed Collins's testimony about his limitations with memory, completing tasks, concentrating, and following instructions. *Id*.

The first "sign and symptom" due to Collins's impairments cited by the ALJ was Collins's memory loss. *Id*. The ALJ noted that Collins specifically mentioned a decrease in short-term memory as evidence by his forgetting his granddaughter's name. *Id*. As Collins points out, the ALJ cited Collins's diagnosis with memory loss in October 2019. Tr. 52 (citing Tr. 773). But the ALJ also cited the continued effects that memory loss has had on Collins's ability to function. Tr. 52–54 (referencing appointments on January 8, March 6, April 7, June 9, September 1, and September 9, 2020 during which Collins or his treatment provider mentioned memory loss or focus concerns).

Moreover, the ALJ referenced cognitive issues when acknowledging Collins's impairments and noting how he had accounted for them in the RFC. The ALJ credited Collins's "intellectual decline and brain changes ... possibly secondary to his history of lead exposure and ... obstructive sleep apnea ... include[ing] significant memory deficits in the specific index areas of auditory memory, visual working memory, immediate memory, and delayed memory." Tr. 59.

The ALJ accounted for Collins's memory and focus deficiencies in the RFC by limiting Collins to performing simple, routine tasks, and understanding, carrying out, and remembering simple instructions. *Id.* The ALJ recognized deficiencies in perseverance, attention, vigilance, and impulse control by limiting Collins to work tasks to those that were simple or routine and which Collins understood and knew how to complete. Tr. 59–60. The ALJ limited Collins to work that he would be able to do for at least two hours at a time and could stay on task at a sustained rate. *Id.*

The ALJ accounted for Collins's insight and judgment deficits, and his need to avoid stress, by restricting high production quotas and piece rate work. Tr. 60. He acknowledged Collins's mood abnormalities and difficulty with social interaction by limiting Collins to no more than superficial, occasional interactions with the public and co-workers and prohibited work that required arbitration, negotiation, confrontation, supervision, or commercial driving. *Id.* In so doing, the ALJ addressed Collins's issues with memory, focus,

38

perseverance, frustration, diminished coping skills, and ability to handle work pressure. The ALJ thus followed the requirements of Ruling 16-3p in his analysis.

So the ALJ complied with SSR 16-3p and cited substantial evidence in the record in support of his conclusions "so [that] the individual and any subsequent reviewer [could] assess how the [ALJ] evaluated [Collins's] symptoms." SSR 16-3p, 2017 WL 5180304, at *10. The ALJ's narrative detailed specific reasons for each finding. In contrast, Collins fails to articulate how the ALJ's conclusions were not supported by substantial evidence.

Collins, however, says that "the ALJ failed to articulate any supportable rationale for his finding that Plaintiff's statements, as detailed above, were not entirely consistent with the medical evidence." Doc. 6, at 19. But this assertion cannot be squared with the ALJ's decision in which explained why Collins's statements were not consistent with the medical evidence. *See* Tr. 51–58.

Collins also spills a good deal of ink laying out his view of the facts in which he sprinkles complaints about the ALJ's RFC determination. Doc. 6, at 15–18. But the initial order in this matter directed that "[e]ach introductory heading in the Argument or Analysis section of a brief must correspond to the argument presented under the heading." Doc. 3, at 3. And it warned that "[f]ailure to comply with this requirement may result in … waiver of the arguments in the heading and in the text following the heading." *Id*. at 3–4.

Here, Collins's heading for his second argument indicates that his second issue is about Ruling 16-3p. Doc. 6, at 14. And that's what he discusses in his first paragraph and the second half of his argument. *See id*. at 14–15, 18–20. So any argument under Collins second issue about the ALJ's RFC assessment is forfeited. And, as is explained with respect to Collins's first issue, substantial evidence supports the ALJ's RFC assessment.

**Conclusion**

For the reasons explained above, I recommend that the Court affirm the Commissioner's decision.

Dated: February 29, 2024

*/s/ James E. Grimes Jr.*
James E. Grimes Jr.
U.S. Magistrate Judge

**OBJECTIONS**

Any objections to this Report and Recommendation must be filed with the Clerk of Court within 14 days after the party objecting has been served with a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *See Berkshire v. Beauvais*, 928 F.3d 520, 530–531 (6th Cir. 2019).